IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

OLLIE J. BARTON and KAY F.
GRANT,

      **Plaintiffs,**

vs.                                                                 No. CIV 04-1123 LH/DJS

**OXY USA, INC. and BP AMERICA
PRODUCTION COMPANY, formerly known
as AMOCO PRODUCTION COMPANY,**

      **Defendants.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** is before the Court on Plaintiffs' Motion for Sanctions Against Defendant BP America Production Company (BP) **[Doc. No. 48]**, filed September 6, 2005. Plaintiffs bring their motion for sanctions pursuant to Rule 37 of the Federal Rules of Civil Procedure. Plaintiffs contend Defendant BP failed to comply with the Court's July 27, 2005 Memorandum Opinion and Order, directing Defendant BP to respond to Plaintiffs' discovery requests. Plaintiffs claim they "essentially have no more information from BP than they had prior to the Court's granting of their Motion to Compel . . . ." Pls.' Mot. for Sanctions at 4.

Federal Rule of Civil Procedure 37(b)(2) authorizes the Court to sanction a party who "fails to obey an order to provide or permit discovery." The Court has broad discretion in issuing sanctions for discovery abuse. *Gutierrez v. Hackett*, 131 Fed.Appx. 621, 625 (10th Cir. May 3, 2005). However, the Court's discretion in choosing an appropriate sanction "is limited in that the chosen sanction must be both just and related to the particular claim which was at issue in the

order to provide discovery." *The Procter and Gamble Company v. Haugen*, 427 F.3d 727, 738 (10th Cir. 2005)(quoting Ehrenhaus *v. Reynolds,* 965 f.2d 916, 920 (10th Cir. 1992)).

In addition to attorney's fees, Plaintiffs request the following relief: (1) an order finding that Defendant BP's documents BP00882-BP00985, submitted in response to Plaintiffs' Interrogatory No. 12 and Request for Production 7, were the only notice Defendant BP gave to Plaintiffs or their predecessors in interest regarding carbon dioxide operations on the Subject Lands and proceedings before the OCD to increase well spacing from 160 acres to 640 acres on lands within the Bravo Dome Unit; (2) an order precluding Defendant BP from raising the defenses of standing, statute of limitations, and failure to join indispensable parties or introducing any evidence regarding such defenses; (3) an order refusing to allow Defendant BP to oppose Plaintiffs' calculations of carbon dioxide revenues owing by Defendant BP to Plaintiffs; and (4) an order granting Plaintiffs a default judgment against Defendant BP for liability on Plaintiffs' claims.

In its response, Defendant BP claims it has had to overcome many obstacles in order to respond to Plaintiffs' discovery requests. Specifically, "the passage of time and BP's sale of the Bravo Dome facilities to OXY USA, Inc (OXY)." Def.'s Resp. to Mot. for Sanctions at 1. According to Defendant BP, Plaintiffs claim to have an interest in carbon dioxide production in the Bravo Dome facilities that began more than twenty years ago. Additionally, Defendant BP sold its interest in the Bravo Dome facilities to Defendant OXY in 2001 and, at that time, transferred all of its files and records to Defendant OXY. Defendant BP claims it "does not have many of the records that Plaintiffs have requested, and witnesses with a complete knowledge of the relevant facts spanning the entire time frame of BP's ownership cannot be found." *Id.*

Defendant BP asserts it has attempted in good faith to respond completely to Plaintiffs' discovery requests and to comply with this Court's prior [discovery] order." *Id.* at 2. Defendant BP also asserts it has provided Plaintiffs with all the information it had and has identified the information it does not have. Additionally, Defendant BP contends it informed Plaintiffs of an employee who worked at one time on the Bravo Dome accounting matters and also identified the documents in that individual's possession and claims Plaintiffs' counsel stated they had no interest in reviewing those documents.

**Interrogatory No. 12 and Request for Production No. 7**

Plaintiffs Interrogatory No. 12 asks for a detailed description of "all notices given by you or on your behalf to Plaintiffs or their predecessors in interest regarding carbon dioxide operations on the Subject Lands proceedings before the New Mexico Oil Conservation Division (OCD) to increase well spacing from 160 acres to 640 acres on lands within the Bravo Dome Unit." Pls.' Ex. B.

Request for Production No. 7 requests "[a]ll documents reflecting the notice given by you or on your behalf to interested parties, including Plaintiffs and their predecessors in interest, in connection with carbon dioxide operations on the Subject Lands and proceedings brought before the OCD to increase well spacing from 160 acres to 640 acres on lands within the Bravo Dome Unit.

On August 5, 2005, Defendant BP served Plaintiffs with its Supplemental Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents. Pls.' Ex. B. Defendant BP supplemented its response to Interrogatory No. 12 and Request for Production No. 7. In its supplemental response, Defendant BP answered:

> BP states that a title opinion was completed on Amoco Production Company's behalf in order to determine ownership of Township 20 North, Range 34 East in Union County, New Mexico. This document has previously been produced to Plaintiffs (Bates No. BP00001-00008).  BP has no further information in its possession responsive to this request.

Pls.' Ex. B.  Plaintiffs contend Defendant BP provided no notices from any proceedings before the OCD.  Plaintiffs also allege Defendant BP has "previously objected to producing any OCD records as allegedly being publicly available."  Pls.' Mot. for Sanctions at 2.

In its Response to Motion for Sanctions, Defendant BP now represents that "on May 19, 2005, BP did locate relevant OCD orders which it offered to produce to Plaintiffs upon their request."  Def.'s Resp. at 4; *see also*, Def.'s Ex. 2 ("BP has located the relevant OCD orders (See Order R-7556 and R-7556-A) changing the spacing units to 640 acres and will provide those to you **upon request**.  You will note that each order finds that due public notice was given as required by law.").  As to "notice given to Plaintiffs regarding carbon-dioxide operations on the subject lands," Defendant BP states in its response that it "produced documents showing notice of carbon-dioxide operations."  Def.'s Resp. at 4.

Defendant BP fails to explain why it took until May 19, 2005, to locate documents Plaintiffs requested in their January 24, 2005 First Set of Interrogatories and Request for Production of Documents.  Moreover, Plaintiffs should not have to request documents they previously requested.  If Defendant BP has not yet provided Plaintiffs with the OCD orders, it shall do so without delay.

**Interrogatory No. 4**

In Interrogatory No. 4, Plaintiffs seek information regarding how Defendant BP calculated revenues paid to mineral interest owners for carbon dioxide produced from the Bravo Unit, including revenues paid to the State Land Office and Minerals Management Services.

On August 23, 2005, Defendant BP served another Supplemental Response to Plaintiffs' First set of Interrogatories and Request for Production of Documents. Pls.'s Ex. C. In response to Interrogatory No. 4, Defendant BP answered:

> Payments to all interest owners including royalty, overriding royalty, the MMS, and the SLO, were based on BP Amoco's weighted averaging sales prices and the prices provided by other Unit owners to arrive at a Bravo Dome weighted average price. Likewise, certain working interest costs that are a component in valuations were also weight averaged to arrive at a Unit cost component. Based on a cursory review of unit gas imbalances, we do not believe that Amoco was marketing for or making revenue distribution to other working interests unless it was purchasing $CO_2$ from them under the terms of a contract.
>
> As a result of the Feerer settlement effective January 1998, Amoco calculated Feerer class member payments by using only the price Amoco received for certain $CO_2$ sales; rather than paying on a Unit weighted average. Amoco also ceased including the aforementioned cost components and affiliate marketing fees in calculating payments to class members.
>
> John B. Smith was the IBM accounting manager for BP Amoco Royalty distributions in this area from about 1997 into 2000 and is currently a processing manager with IBM.

Pls.' Ex. C. Plaintiffs complain that Defendant BP "provides a general response and does not specifically identify the methodology nor provide specifics as to the cost factors employed in arriving at the weighted average sales price that BP states was used." Pls.' Mot. at 3. In addition, Plaintiffs complain that they requested "all persons with knowledge of such calculations," yet Defendant BP "provided the name of one individual who only had knowledge of BP's royalty distributions for a three-year period." *Id.*

In its response, Defendant BP argues that "What Plaintiffs' (sic) apparently fail to realize is the complexity of the question that they ask." Def.'s Resp. at 4. This is so because "BP's accountants had to perform complicated accounting calculations to reach a Unit price and/or cost to uniformly pay revenue to the various interest owners." *Id.* Defendant BP also asserts it did not list Jeff Voss, the accounting manager before Jim B. Smith, because Jeff Voss is deceased. Def.'s Resp. at 7.

That Defendant BP's accountants had to perform "complicated accounting calculations" to reach a unit price and/or cost is not a basis for not providing the requested information. The fact remains that Defendant BP's accountants performed the calculations. Therefore, the manner in which the accountants performed the calculations should be information available to Defendant BP. In fact, Defendant BP provided the information requested in Interrogatory 4 in its response. Again, Defendant BP offers no explanation for providing the requested information at this time and not when requested on January 24, 2005.

**Interrogatories Nos. 5 & 7 and Request for Production Nos. 3, 4, & 5**

Interrogatory No. 5 asks for a detailed description of how Defendant BP "determined the gross price for $CO_2$ produced from the Subject Lands during the Subject Period, broken down by well, and identify the persons who made the determinations." Pls.' Ex. C.

Defendant BP's August 23, 2005 Supplemental Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents provided the following response to Interrogatory No. 5:

> As described in our answers to Interrogatories 4 and 7, the gross price was determined based on a weighted average of all sales by the working interest owners. The price was not broken down by well; rather, a Unit weighted average price was calculated and applied to all production. The BP Amoco accountants calculated the Unit weighted average gross price.
>
> John B. Smith was the IBM accounting manager for BP Amoco royalty distributions in this area from about 1997 into 2000 and is currently processing manager with IBM.

Pls.' Ex. C.

Interrogatory No. 7 asks for a description of "all prices or transfer values received by you or your affiliates and the point of valuation and point of transfer for all $CO_2$ produced from the

6

Subject Lands during the Subject Period, including but not limited to the Denver city price index."

Pls. Ex. C.

Defendant BP's August 23, 2005 Supplemental Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents provided the following response to Interrogatory No. 7:

> The BP Amoco points of transfer in general included relatively small sales to local consumers in the area of the Unit, much larger sales to the mature CO2 floods in the Permian basin of West Texas and New Mexico, and later to the emerging CO2 floods of the Postle field in western Oklahoma and Kansas. The values were typically the result of multiple contracts. The exact prices are not possible to extract at this point because those calculations were made offline and kept on an accounting system that was several generations before the current system. This information may be possible to obtain from the underlying contracts. A partial set of contracts has been located and will be provided (See Request for Production No. 3). However, a complete set of contracts would have been transferred to OXY when BP sold its interest.
>
> Prior to 1999, Amoco Production Company transferred most production to Amoco Oil company. Amoco Oil company paid Amoco Production Company on the weighted average of Amoco Oil's sales less transportation and a $0.03/mcf marketing fee.

Pls.' Ex. C.

Request for Production No. 3 asks for "[a]ll documents which reflect the prices or transfer values received by you and the point of valuation and point of transfer for all $CO_2$ produced from the Subject Lands during the Subject Period." Pls.' Ex. C.

Defendant BP's August 23, 2005 Supplemental Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents provided the following response to Request for Production No. 3:

> Copies of documents responsive to this request are attached hereto as Bates No. BP00986-BP01576. BP states that these documents reflect what are in BP's possession and do not represent a complete set of documents and/or data. Additionally, the attached spread sheet (Bates No. BP01577-BP01581) named "file search 3.xls" lists the description for 127 boxes, which based on the description John B. Smith believes may contain responsive records."

Pls.' Ex. C.

Request for Production No. 4 asks for "[a]ll documents which reflect your calculation of the gross price for CO2 produced from the Subject Lands during the Subject Period." Pls.' Ex. C.

Defendant BP's August 23, 2005 Supplemental Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents provided the following response to Request for Production No. 4:

> The attached spread sheet (Bates No. BP01577-BP01581) named "file search 3.xls" lists the description for 127 boxes, which based on the description John B. Smith believes may contain responsive records.

Pls.' Ex. C.

Request for Production No. 5 asks for "[a]ll documents which reflect any contractual relationship between you and any affiliate with respect to the production, processing, transportation, marketing, receipt or use of CO2 produced from the Subject Lands during the Subject Period, including but not limited to balancing agreements and buy/sell agreements." Pls.' Ex. C.

Defendant BP's August 23, 2005 Supplemental Response to Plaintiffs' First Set of Interrogatories and Request for Production of Documents provided the following response to Request for Production No. 5:

> Copies of documents responsive to this request are attached hereto as Bates No. BP00986-BP01568. BP states that these documents reflect what are in BP's possession and do not represent a complete set of documents and/or data. Additionally, the attached spread sheet (Bates No. BP01577-BP01581) named "file search 3.xls" lists the descriptions for 127 boxes, which based on the description John B. Smith believes may contain responsive records.

Pls.' Ex. C.

In its motion, Plaintiffs complained that Defendant BP did not "state *where* these boxes are, BP does not state *when* these boxes will be available for inspection, and the spreadsheet descriptions provided for these boxes often do not state exactly *what* is contained within the boxes." Pls.' Mot. at 3. Thus, Plaintiffs contend this no more than a belated "data dump."

Again, in its response, Defendant BP informed Plaintiffs that the boxes were located in Tulsa, Oklahoma. However, Defendant BP contends Plaintiffs should travel to Tulsa to inspect these records. Def.'s Resp. at 8. Defendant BP contends Rule 33(d) of the Civil Rules of Civil Procedure allows for "business records to be produced 'where the answer to an interrogatory may be derived or ascertained from the business records . . . .'" Def.'s Resp. at 7. Defendant BP also claims it provided "an index specifying those records from which answers may be derived." *Id.* at 8. Defendant BP contends the index describes the contents of the 127 boxes. *Id.*

> Rule 33(d) states:
>
> Where the answer to an interrogatory may be derived or ascertained from the business records of the party upon whom the interrogatory has been served or from an examination, audit or inspection of such business records, including a compilation, abstract, or summary thereof, and the burden of deriving or ascertaining the answer is substantially the same for the party serving the interrogatory as for the party served, it is sufficient answer to such interrogatory to specify the records from which the answer may be derived or ascertained and to afford to the party serving the interrogatory reasonable opportunity to examine, audit or inspect such records and to make copies, compilations, abstracts or summaries. <u>A specification shall be in sufficient detail to permit the interrogating party to locate and to identify, as readily as can the party served, the records from which the answer may be ascertained.</u>

Fed.R.Civ.P. 33(d)(emphasis added).

Rule 34 governs requests for production of documents. Fed.R.Civ.P. 34. Rule 34(b) provides that a party who produces documents for inspection "shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." Fed.R.Civ.P. 34(b). "This provision was added to Rule 34(b) to prevent parties

9

from 'deliberately . . . mix[ing] critical documents with others in the hope of obscuring significance." *Cardenas v. Dorel Juvenile Group, Inc.*, 230 F.R.D. 611, 617 (D.Kan. 2005).

In their reply, Plaintiffs contend the index is not clear as to what is in the boxes because the "descriptions of the documents included in the boxes are often vague, such as 'Bravo Dome 87-08-30HC' and 'Bravo Dome 1986 Revenue Various Files' . . . ." Pls.' Reply at 2. According to Plaintiffs, the index does not assist them in determining which boxes to review. Moreover, Plaintiffs contend they should not have to travel to Tulsa, Oklahoma to inspect these boxes at such a late date.

Because Defendant BP did not promptly respond to Plaintiffs' January 24, 2005 First Set of Interrogatories and Request for Production of Documents and failed to explain why it found the requested information only after Plaintiffs filed their motion to compel, the Court finds that Defendant BP shall copy and deliver to Plaintiffs' counsel's office the following boxes of documents: 3513035.01, 3515068.0, 4011155.0, 4011156.0, 0907259.0, 0907260.0, and 1009148.0.

The Court also notes that in its July 27, 2005 Memorandum Opinion and Order the Court ordered Defendant BP to "provide the requested information in its possession and indicate which information is in Defendant Oxy's possession." Mem. Op. and Order at 7. The Court took this measure because Defendant BP consistently argued it had "transferred all of its files and records to Oxy in 2001" to excuse it from responding to Plaintiffs' discovery requests. In their reply, Plaintiffs contend Defendant BP has not complied with the Court's directive. Defendants shall provide Plaintiffs with this information.

Finally, on January 4, 2006, Plaintiffs filed a Supplement to Plaintiffs' Motion for Sanctions Against BP America Production Company **[Doc. No. 86]**. In their Supplement, Plaintiffs contend Defendant BP "maintains active computer databases containing information reflecting production, sales and costs of $CO_2$ produced from the Bravo Dome Unit, which is the information requested by Plaintiffs in this case, none of which databases have been produced by BP in this case." Pls.' Supplement at 2. Plaintiffs rely on John B. Smith's representations during his deposition to make this assertion.

Defendant BP submitted an affidavit from John B. Smith to expound on his deposition testimony regarding "active computer databases." According to Mr. Smith's affidavit:

> BP and IBM have used a number of different data management systems over time. Bravo Dome accounting was only migrated to a computer software application called PREMAS in or around 1995. Before that IBM and BP utilized a "home grown" system, that is, a unique, one-of-a-kind system, which would be very archaic today. It used mainframe computing, hierarchical table structures, and cobol language. Calculations were done in massive mainframe spread sheets. All source data was handwritten and keypunched for mainframe computing. The data from this system was not transitioned into the PREMAS system. This system was decommissioned and certain data table were archived on tape.
> Some of the electronic table data from the "home grown" maintenance computing system (pre-1995) may still exist, but it would be impossible to interpret and have no meaning without relying on hard copy documents to give it context. For example, I might extract electronic data that told me 100 mcf of volume was associated with tract 496 in July 1990. Without going to the hard copy of documents, I could not tell if the 100 mcf represented total tract production, the oil and gas operator's take from the tract, or something else entirely.
>
> When PREMAS was implemented in 1995, only revenue accounting, production and sales valuation departments used this system. Investment accounting and operating expense accounting was mostly manual until 1997 when these processes began using a software application called SAP. Revenue accounting migrated to SAP in 2000, but the Bravo Dome Unit revenue accounting continued to be performed in PREMAS until the property was sold. PREMAS, however, is still "on line active" and is used as needed.
>
> ** ** ** ** **
> In order to extract data that exists in the systems, other than routine production information such as pay detail or expense ledger, custom program codes must be written to query the tables. Once the data is pulled down, a significant amount of time goes into understanding and validating the data, to determine whether the query generated the data we intended. It is,

11

>essentially, a manual, rather than electronic, exercise. To the best of my knowledge, there is no other way to generate such information, and it cannot be done by anyone without access to and significant training with the computer systems.

Smith Aff. ¶¶4, 6, and 10. Therefore, Defendant BP has presented evidence that it does not have "databases" in the form Plaintiffs request.

**Plaintiffs' Request for Attorney's Fees**

Rule 37 of the Federal Rules of Civil Procedure provides for sanctions to be paid to a moving party when a motion to compel is granted. *See* Fed.R.Civ.P. 37(a)(4)(A). Rule 37 states in pertinent part:

>If a party fails to make a disclosure required by Rule 26(a), any other party may move to compel disclosure and for appropriate sanctions.
>
>If the motion is granted or if the disclosure or requested discovery is provided after the motion was filed, the court shall, after affording an opportunity to be heard, require the party . . . whose conduct necessitated the motion . . . to pay to the moving party the reasonable expenses incurred in making the motion, including attorney's fees . . . .

Fed.R.Civ.P. 37(a)(2)(A) & (4)(A). The Due Process Clause of the Fifth Amendment requires that an individual facing sanctions in federal court be given notice and an opportunity to be heard before final judgment. *G.J.B. & Associates, Inc. v. Singleton*, 913 F.2d 824, 830 (10th Cir. 1990). The process due depends upon the severity of the sanctions being contemplated. *Id.* The process required when the Court contemplates imposition of attorney's fees and costs is no more than an opportunity to brief the issue. *Id.*

In this case, the facts support the imposition of sanctions against Defendant BP for failing to comply with Plaintiffs' discovery requests. Accordingly, within ten days of the date of this order, Plaintiffs shall file with the Court a notice, supported by appropriate evidence, setting forth details as to the reasonable attorney's fees and other costs they expended in filing their Motion to

Compel.  Upon the Plaintiffs' filing, Defendant BP shall have 10 days to file any objections to the amount requested by Plaintiffs.  The Court will thereafter enter a supplemental order setting forth the amount Defendant BP must pay and directing it to make payment within ten days**.        NOW, THEREFORE,**

**IT IS HEREBY ORDERED** that, within seven (7) days from entry of this Memorandum Opinion and Order, Defendant BP shall copy and deliver to Plaintiffs' counsel's office the following boxes of documents: 3513035.01, 3515068.0, 4011155.0, 4011156.0, 0907259.0, 0907260.0, and 1009148.0.  If Plaintiffs request additional boxes, Defendant BP shall copy and deliver to Plaintiffs' counsel office these additional documents within seven (7) days of Plaintiffs' request.

**IT IS FURTHER ORDERED** that, within seven (7) days from entry of this Memorandum Opinion and Order, Defendant BP shall provide Plaintiffs with a list of information responsive to Plaintiffs' discovery requests that is in the possession of Defendant Oxy.

**IT IS FURTHER ORDERED** that, within ten (10) days from entry of this Memorandum Opinion and Order, Plaintiffs shall file with the Court a notice, supported by appropriate evidence, setting forth details as to the reasonable attorney's fees and other costs they expended in filing their motion.

```
_____
DON J. SVET
UNITED STATES MAGISTRATE JUDGE
```