IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**OLLIE J. BARTON and KAY F. GRANT,**
        **Plaintiffs,**

v.                                                         **CIV No. 04-1123 LH/DJS**

**BP AMERICA PRODUCTION COMPANY, formerly known as AMOCO PRODUCTION COMPANY,**
        **Defendant.**

**MEMORANDUM OPINION AND ORDER NO. 6**

       **THIS MATTER** comes before the Court on Plaintiffs' Supplemental Brief on Damages (Doc. No. 126, filed May 1, 2007). The Court, having considered the supplemental brief, the response and reply thereto, as well as applicable statutory and case law, concludes that the 640-acre spacing order applies to the Cushman interest, that BP America Production Company ("BP") is liable to pay Plaintiffs 12.5% NRI, and that prejudgment interest shall be awarded at an annually accrued rate of 8% per annum.

**The Rule of Capture Does Not Apply**

       Plaintiffs argue that they are entitled to 50% net revenue interest ("NRI") because the Cushman Interest was not pooled with the other interests. (*See* Plaintiff's Supplemental Brief on Damages at 4-7, Doc. No. 127, filed May 1, 2007 ("Supplemental Brief")). Consequently, Plaintiffs argue, the common law rule of capture applies. (*See id.*). The Court disagrees.

       New Mexico statutes have abrogated the rule of capture. New Mexico has enacted law to

protect correlative rights.  *See* N.M. Stat. Ann. § 70-2-11(A) (Oil conservation division is empowered, and has duty, to protect correlative rights).[1]  "Where the state . . . undertakes to protect the correlative rights of owners in a common source of supply, the law of capture . . . does not apply."  *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1491 (10th Cir. 1995).

Plaintiffs acknowledge that "[w]hen New Mexico adopted laws governing pooling of wells and well locations, it similarly abrogated the common law rule of capture that existed before state regulation."  (Supplemental Brief at 6).  Plaintiffs, however, argue that BP's failure to pool the Cushman interest violates the state's "conservation scheme" and, therefore, BP has lost the protection of the state's conservation scheme.  (Plaintiffs' Reply at 2-3, Doc. No. 132, filed June 20, 2007).  Plaintiffs cite no legal authority for the proposition that failure to comply with state law reverses the abrogation of the rule of capture.

**Preventing Waste and Protecting Correlative Rights**

The New Mexico Oil Conservation Division is empowered to make rules and regulations to carry out two primary duties:  (1) to prevent waste, and (2) to protect correlative rights.  N.M. Stat. Ann. § 70-2-11(A).

"Waste" means, among other things, the locating and spacing of wells in a manner which reduces the total quantity of gas ultimately recovered from a pool, the production of gas in excess of reasonable market demand, and excessive drilling.  N.M. Stat. Ann. § 70-2-3; *Rutter v. Wilbanks*, 532 P.2d 582 (N.M. 1975) ("prevention of wasteful, excessive drilling . . . was a primary Legislative

---

[1] The New Mexico Oil Conservation Division ("the Division") administers "rules on the conservation, the production and the prevention of waste of carbon dioxide . . . in the same manner as it regulates, conserves and prevents waste of natural or hydrocarbon gas."  N.M. Stat. Ann. § 70-2-34(A).  "Where applicable, the provisions of the Oil and Gas Act [70-2-1 NMSA 1978] relating to gas or natural gas shall also apply to carbon dioxide."  *Id.*

consideration in the enactment of the original Well Spacing Act.").

"'Correlative rights' means the opportunity afforded, so far as it is practicable to do so, to the owner of each property in a pool to produce without waste his just and equitable share of the oil or gas or both in the pool, being an amount, so far as can be practicably determined and so far as can be practicably obtained without waste, substantially in the proportion that the quantity of recoverable oil or gas or both under the property bears to the total recoverable oil or gas or both in the pool and, for such purpose, to use his just and equitable share of the reservoir energy." N.M. Stat.Ann. § 70-2-33(H).

To prevent waste and to protect correlative rights, the Oil Conservation Division is authorized to make rules, regulations and orders to fix the spacing of wells and pool tracts of land in a spacing unit. N.M. Stat.Ann. §§ 70-2-12(B)(10) and 70-2-17.

**Well Spacing**

Under statewide rules, carbon dioxide wells are spaced on 160 acres. *See* N.M.A.C. 19.15.3.104(C)(3) ("160-acre spacing applies to any other gas well not covered above"); N.M.A.C. 19.15.6.406 (statewide regulations relating to gas wells, including those provisions relating to well locations and acreage dedication requirements, apply to carbon dioxide wells). These spacing rules are "rules of general application, and are not based upon engineering and geological conditions in a particular reservoir." *Uhden v. New Mexico Oil Conservation Comm.*, 817 P.2d 721, 723 (N.M. 1991).

A gas interest owner can apply to increase the spacing required by statewide rules. *Uhden*, 817 P.2d at 723 (N.M. 1991); N.M. Stat. Ann. § 70-2-18(C) (Oil Conservation Division may

3

establish nonstandard spacing units); *see also* N.M.A.C. 19.15.1.7(S) ("Spacing unit shall mean the area allocated to a well under a well spacing order or rule."). Increasing the spacing may be done by application and hearings where the applicant presents witnesses regarding the engineering and geological properties of a particular reservoir. *Uhden*, 817 P.2d at 723. "[A] spacing order can only be modified upon substantial evidence showing a change of condition or change in knowledge of conditions, arising since the prior spacing rule was instituted." *Id.*

**Pooling**

For spacing units with divided mineral ownership, gas well operators must either obtain voluntary pooling agreements or apply for an order of the division pooling the lands dedicated to the spacing unit. N.M. Stat. Ann. § 70-2-18 (B). Pooling is "the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules." *Uhden*, 817 P.2d at 723; *Kysar v. Amoco Prod. Co.*, 93 P.3d 1272, 1277 (N.M. 2004) (purpose of pooling is to create sufficient acreage to receive a well drilling permit under the relevant state or local spacing laws and regulations). Pooling may be voluntary or compulsory.

Voluntary pooling agreements include a formula for participation in expenses and production. 6 Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW § 924 (2006). Surface acreage may be an appropriate basis in some pooling agreements, but in some cases other factors, such as volume of productive formation, may be included in the participation formula. *Id.* §§ 921.8, 924, 970.1-2, 970.4. An interest owner may choose not to join a voluntary pooling agreement based on surface acreage if there is a reasonable basis to believe that the owner's tract has better productive potential than the other tracts covered by the pooling agreement. *See* Richard S. Morris,

Compulsory Pooling of Oil and Gas Interests in New Mexico, 3 Nat. Resources J. 316, 322 (1963).

Where all of the tract owners in a spacing unit have not voluntarily agreed to pool their interests, the Oil Conservation Division must pool the lands or interests to prevent waste and protect correlative rights. N.M. Stat. Ann. § 70-2-17(C).  Orders affecting compulsory pooling, made after notice and hearing, allocate the production of the pooled gas to the various "tracts within the unit in the proportion that the number of surface acres included within each tract bears to the number of surface acres included in the entire unit." *Id.*

Any operator failing to obtain voluntary pooling agreements, or failing to apply for an order of the division pooling the lands dedicated to the spacing unit, shall be liable to account to and pay each owner of mineral or leasehold interest, either the amount to which each interest would be entitled if pooling had occurred or the amount to which each interest is entitled in the absence of pooling, which ever is greater.  N.M. Stat. Ann. § 70-2-18(B).

### Allocation of Production

According to the definition of 'correlative rights,' a property owner is entitled to the quantity of recoverable gas, so far as can be practicably determined and so far as can be practicably obtained without waste, substantially in the proportion that the quantity of recoverable gas under the property bears to the total recoverable gas in the pool.  *See* N.M. Stat. Ann. § 70-2-33.H.

There are two methods for determining the quantity of recoverable gas to which an owner is entitled.  *See Amoco Prod. Co. v. Heimann*, 904 F.2d 1405, 1409 (10th Cir. 1990) (New Mexico Oil Conservation Commission finding two methods for protecting correlative rights through distribution of production:  (a) a formula which provides that owners share in production in the same

proportion as each owner's acreage interest in the unit bears to the total unit acreage, and (b) a method based upon completion of wells and geologic and engineering interpretation of productive acreage).

The proportional acreage method is used when owners have not agreed to pool their interests and the Oil Conservation Division enters a compulsory pooling order:

> For the purpose of determining the portions of production owned by the persons owning interests in the pooled . . . gas . . ., such production *shall* be allocated to the respective tracts within the unit in the proportion that the number of surface acres included within each tract bears to the number of surface acres included in the entire unit.

N.M. Stat. Ann. § 70-2-17(C) (*emphasis added*). The proportional acreage method for allocating production from a well "is a reasonable and logical one, if perhaps not the most complete or accurate method that may be used when more subsurface information becomes available." *Rutter & Wilbanks Corp. v. Oil Conservation Comm.*, 532 P.2d 582, 588 (N.M.1975).

The second method for allocating production from a well is to consider the characteristics of the productive formation beneath the tracts served by the well. Those characteristics may include thickness of the productive formation, amount of gas initially in place beneath a tract, porosity, permeability, pressure, etc.. 6 Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW §§ 970.1-2 (2006). Because the formation characteristics may vary spatially, the amount of recoverable gas beneath two tracts of equal size may differ. *See Rutter & Wilbanks Corp.,* 532 P.2d at 587(some indication that tract owners in one area had no recoverable gas underlying their property). Determining the amount of recoverable gas by considering formation characteristics requires a sufficient amount of geological and other data. *See* 6 Howard R. Williams & Charles J. Meyers, OIL AND GAS LAW § 970.2 (2006) (whenever there has not been full development of an area

by reasonably dense spacing of wells, there exists the possibility of contrary interpretations of the geological and other data).

**BP's Liability**

The issue before the Court is to determine the amount that BP is liable to pay Plaintiffs, "either the amount to which each interest would be entitled if pooling had occurred or the amount to which each interest is entitled in the absence of pooling, which ever is greater." N.M. Stat. Ann. § 70-2-18(B). Those amounts are based upon the allocation of production from the well and, as discussed above, there are two methods for determining production allocation: (1) the proportional acreage method, and (2) the formation characterization method.

Both the proportional acreage method and the formation characterization method can be used to allocate production in the absence of pooling and when there is a voluntary pooling agreement. Only the proportional acreage method may be used when there is compulsory pooling. *See* N.M. Stat. Ann. § 70-2-17(C) (when the Oil Conservation Commission enters an order pooling interests, "production *shall* be allocated to the respective tracts within the unit in the proportion that the number of surface acres included within each tract bears to the number of surface acres included in the entire unit") (*emphasis added*).

The issue of the greater amount of liability, pooled versus unpooled, could, in some cases, depend on the method used to allocate production. The amount BP would be liable to pay Plaintiffs under the proportional acreage method could differ from that amount determined by the formation characterization method. For example, if there were little or no gas underlying Plaintiffs' tract, and if there were sufficient geological data, the formation characterization method would allocate little

or no production to Plaintiffs while the proportional acreage method would allocate production based on Plaintiffs' tract acreage, which could be a larger amount than actually underlies Plaintiffs' tract. Conversely, if most of the gas in the unit is under Plaintiffs' tract, then the formation characterization method would likely allocate more production to Plaintiffs than would the proportional acreage method.

In the case before the Court, the parties do not dispute which method, proportional acreage or formation characterization, should be used to allocate production from the well. Plaintiffs and BP appear to agree that the proportional acreage method is appropriate, presumably because there is not sufficient geological and engineering data to apply the formation characterization method. Under New Mexico law, the proportional acreage method is appropriate when interests are unpooled and when there is voluntary or compulsory pooling. The Court will, therefore, use the proportional acreage method to determine the amount that BP is liable to pay Plaintiffs.

The issue now becomes determining Plaintiffs' proportional acreage. The following facts are not disputed: (1) Plaintiffs own a one-half mineral interest in 160 acres of a 640-acre section of land (Plaintiffs Supplemental Brief on Damages at 2-3); (2) the normal statewide well spacing is 160 acres. (*Id*. at 7); and, (3) the Oil Conservation Division entered an order providing for a special 640-acre well spacing (*Id*.). BP contends that the Plaintiffs' proportional acreage should be calculated using the special 640-acre spacing resulting in a 12.5% NRI. Plaintiffs argue that the Oil Conservation Division's special 640-acre spacing order does not apply to the Cushman Interest and that their proportional acreage should be calculated using the normal statewide 160-acre spacing resulting in a 25% NRI.

Plaintiffs maintain that the 640-acre spacing order does not apply to the Cushman Interest

because BP did not provide to the Cushmans proper notice of the OCD proceedings resulting in the special 640-acre spacing order. (Plaintiffs' Supplemental Brief at 7-13; Reply at 7-8). Plaintiffs rely on *Uhden*, 817 P.2d 721. In *Uhden*, Amoco filed an application seeking an increase in well spacing. *Id*. at 722. Amoco had Uhden's mailing address but chose to provide Uhden notice of its application by publication only. *Id.* The New Mexico Supreme Court held that "if a party's identity and whereabouts are known or could be ascertained through due diligence, the due process clause of the New Mexico and United States Constitutions requires the party who filed a spacing application to provide notice of the pending proceeding by personal service to such parties whose property rights may be affected as a result." *Id.* at 531.

The Court is not persuaded by Plaintiffs' argument. The New Mexico Supreme Court in *Uhden* noted that at the time of Amoco's application, state law provided that notice of the Commission hearings and proceedings shall be by personal service *or* publication. *Uhden*, 112 N.M. at 529. The *Uhden* court concluded its opinion stating "the principles set forth in this opinion are applicable to Uhden and to the Commission cases filed after the date of the filing of this opinion." *Id.* at 531. The *Uhden* opinion was filed in 1991.

In the case now before the Court, the Oil Conservation Division issued its 640-acre spacing order in 1984. There is no dispute that Amoco gave both actual notice of the well spacing proceedings to those parties it could locate, and notice by publication to all other parties. Amoco fulfilled its notice obligations under the law in effect at the time.

The Court concludes that the 640-acre spacing order applies to the Cushman interest and that BP is liable to pay Plaintiffs 12.5% NRI. In Plaintiffs' Supplemental Brief on Damages, filed on May 1, 2007, Plaintiffs indicated the "[i]f the Cushman Interest is treated as pooled and subject to

9

special 640-acre well spacing, the result would be a 12.5% NRI. This would result in net revenues owing to Plaintiffs of $276,470.67, excluding interest." Plaintiffs indicate that this figure was calculated by its expert, petroleum engineer Bruce Stubbs, as set forth in Plaintiffs' Exhibit A. This report reviewed the time period from January 1981 through March 2000. At page 12 of its Response, BP indicates that it has analyzed Dr. Stubbs' method of calculating revenues and does not materially dispute his computations. In light of the foregoing, as detailed in a letter sent from the Court to the parties, the parties are directed to make a good faith effort to agree upon the total revenues due Plaintiffs, based upon 12.5% NRI.

**Prejudgment Interest**

In addition to lost revenues, Plaintiffs seek an award of interest on the amount owed, under either N.M. Stat. Ann. § 56-8-3 or N.M. Stat. Ann. § 56-8-4. The trial court is afforded broad discretion in its decision regarding prejudgment interest.

> Section 56-8-3 states that:
>
> > The rate of interest, in the absence of a written contract fixing a different rate, shall be not more than fifteen percent annually in the following cases:
> >
> > A. on money due by contract;
> > B. on money received to the use of another and retained without the owner's consent expressed or implied; and
> > C. on money due upon the settlement of matured accounts from the day the balance is ascertained.

The New Mexico Supreme Court has stated that the purpose of this section "is to compensate the plaintiff for damages resulting from loss of use of funds in cases where money is due by contract, received to the use of another, or due on settlement of matured accounts...." *Sunwest Bank v. Colucci*, 872 P.2d 346, 351 (1994). The obligation to pay prejudgment interest arises by operation

10

of law and constitutes an obligation to pay damages to compensate a claimant for the lost opportunity to use money owed the claimant and retained by the obligor between the time the claimant's claim accrues and the time of judgment (the loss of use and earning power of the claimant's fund). *State ex rel. Bob Davis Masonry, Inc. v. Safeco Ins. Co. of Am.*, 883 P.2d 144, 146-147 (1994). *See* N.M. Stat. Ann. § 56-8-3. The amount of interest awarded is discretionary, but shall not be more than fifteen percent annually. *Id.*[2]

The New Mexico Supreme Court has noted that it is defendant's burden to demonstrate a reason for denying prejudgment interest when this section applies as a matter of right, and when the amount of money that is owed can be calculated with reasonable certainty. *City of Carlsbad v. Grace*, 966 P.2d 1178, 1188 (1998), *citing Sunwest Bank v. Colucci*, 872 P.2d at 351-52. Defendant has not met this burden. As shown by Defendant's statement that it has analyzed Dr. Stubbs' method of calculating revenues and does not materially dispute his computations, the amount owed is readily ascertainable from a computation of the prices received and costs deducted by BP from BP's own records. Under Paragraph (A) of § 56-8-3, this case is one for money due by contract, in this case pursuant to a lease for royalty income. The Court concludes that Plaintiffs are entitled to prejudgment interest, for the loss of use of the revenues awarded herein.

Plaintiffs seek a 15 percent award, however, although allowed by Section 56-8-3, this seems excessive, given the prime rate during the time period during which the royalty payments have been accruing. Instead, the Court will award prejudgment interest at the rate of eight percent, an amount that more closely approximates the prime rate applicable during the time in question. This amount

---

[2] Given the Court's conclusion that BP's obligation to pay prejudgment interest arises by operation of law, pursuant to § 56-8-3, it is unnecessary to determine whether Plaintiffs are also entitled to such interest from the date the complaint was served on Defendants under § 56-8-4(B).

will accrue from the date when the first royalty payment was made under the lease in question.

**Conclusion**

The compensation awarded herein constitutes a recovery for relief sought under Count One of the Complaint, entitled "Accounting." As this Court noted on page 4 of Memorandum Opinion and Order No. 5, this claim constitutes the same relief sought in Count Four, a claim for negligence, wherein Plaintiffs allege a duty of Defendant to account to Plaintiffs for revenues attributable to their mineral interests. Counts One and Four also seek basically the same relief as that sought in Count Six, which asks the Court to declare that Plaintiffs are entitled to an accounting. Mem. Op. and Ord. No. 5 at 4.

Plaintiffs are herein awarded prejudgment interest based on the Court's opinion that this is a claim rooted in contract law, and one in which money was received to the use of another and retained without the owner's consent, pursuant to Section 56-8-3(A) and (B). Indeed, Plaintiffs acknowledge in Footnote 1 of their Supplemental Brief that "[t]his is primarily an accounting case[,]" yet they also seem to contend that they have a pending count for negligence for which they seek recovery of punitive damages "based on BP's failure to exercise reasonable care in ascertaining the identity of the Cushman Interest owners and in failing to pay them CO2 revenues." To the extent that Plaintiffs intend to attempt to assert any further claims for negligence and/or punitive damages, they are legally barred from doing so two reasons.

First of all, as discussed at length by the Tenth Circuit in *Elliott Industries Limited Partnership v. BP America Production Company*, 407 F.3d 1091, 1115-1117 (10th Cir. 2005), in New Mexico, the existence of any tort liability cannot conflict with any contractual duties between

the parties. "No tort duty can be imposed on a party where that party's same duties and rights are specifically defined by contract. *Id..*, *citing Hess Oil Virgin Islands Corp. v. UOP, Inc.,* 861 F.2d 1197, 1200 (10th Cir. 1988). *See also Isler v. Texas Oil and Gas* Corp., 749 F.2d 22 (10th Cir. 1984)).

Furthermore, a claim for punitive damages cannot be premised upon a mere "failure to exercise reasonable care in ascertaining the identity of the Cushman Interest owners and in failing to pay the CO2 revenues[,]" as asserted by Plaintiffs in their footnote. This would amount to punitive damages arising from a negligence claim, which has already been disallowed under *Elliott*.

**WHEREFORE, IT IS HEREBY ORDERED** that, for the reasons stated herein, Plaintiffs are awarded revenues based upon 12.5% NRI.

**IT IS FURTHER ORDERED** that annually accrued prejudgment interest is awarded at the rate of 8% interest per year, from the date of payment of the first royalty payments by Amoco, until the date of entry of a Final Judgment in this matter.

**IT IS SO ORDERED.**

_____
**SENIOR UNITED STATED DISTRICT JUDGE**